IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

VENCE L. THOMASON                                                                PLAINTIFF

v.                                      NO. 3:07CV00078 HDY

MICHAEL J. ASTRUE,                                                               DEFENDANT
Commissioner of the Social
Security Administration

MEMORANDUM OPINION AND ORDER

BACKGROUND. The record reflects that in October of 2004, plaintiff Vence L. Thomason ("Thomason") filed an application for disability insurance benefits pursuant to the provisions of the Social Security Act ("Act"). His application was denied initially and upon reconsideration. He next requested, and received, a de novo administrative hearing before an Administrative Law Judge ("ALJ"). In December of 2006, the ALJ issued a ruling adverse to Thomason. He appealed the ruling to the Appeals Council where the decision of the ALJ was affirmed. The decision of the ALJ therefore became the final decision of the Commissioner of the Social Security Administration ("Commissioner"). In June of 2007, Thomason commenced the proceeding at bar in which he challenged the Commissioner's final decision.

STANDARD OF REVIEW. The sole inquiry for the Court is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. See Prosch v. Apfel, 201 F.3d 1010 (8th Cir. 2000). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." See Id. at 1012.

THE COMMISSIONER'S FINDINGS. The record reflects that the Commissioner made his findings pursuant to the five step sequential evaluation process. At step one, he found that Thomason has not engaged in substantial gainful activity since the alleged onset date of June 6, 2003. At step two, the Commissioner found that Thomason is severely impaired as a result of the following: "hepatitis B, chronic fatigue, kidney pain, mood disorder, personality disorder, and drug dependence." See Transcript at 21. At step three, the Commissioner found that Thomason does not have an impairment or combination of impairments listed in, or medically equal to one listed in, the governing regulations. The Commissioner then assessed Thomason's residual functional capacity and found it to be as follows:

> [Thomason] is affected by hepatitis B, chronic fatigue, and kidney pain. Theses impairments limit his ability to lift heavy objects and ambulate effectively. Therefore, he is exertionally limited to lifting no more than 25 pounds at a time and is capable of sitting for an entire 8-hour day. [He] is also affected by a mood disorder, personality disorder, and drug dependence. These impairments combine to cause mild nonexertional limitations that do not prevent [him] from performing work falling within his exertional abilities.

See Transcript at 25.  At step four, the Commissioner found that Thomason does not retain sufficient residual functional capacity to perform his past relevant work as a restaurant manager and meat cutter.  At step five, the Commissioner solicited the testimony of a vocational expert by asking a hypothetical question containing the following limitations:

> Q.  Okay.  We have a 45-year old man.  He has a past experience as a meat cutter and as a restaurant manager and he has Hepatitis C and he also says these other problems that he has is, is pretty much chronic fatigue.  He says he's pretty good for four hours a day, but after that he goes downhill.  I, I'm not gonna ask you about the meat cutter job because I –
>
> A.  Right.
>
> Q.  – or the restaurant manager because of the Hepatitis C, but let's assume that, that his ability to lift is up to 25 pounds, that's what he says he has to lift now in his job that he's – you, and you say some of the jobs out there at Monroe are sedentary and some of 'em are light.  So if – and he, he says now he sits all day but if he, assuming he can sit all day without any difficulty and that he can lift up to 25 pounds and that he could do his job that he's doing now, I assume, and he can do all of those other sedentary jobs out there at Monroe, is that right?

See Transcript at 487-488.  The vocational expert testified that a hypothetical individual of Thomason's age, education, work experience, and residual functional capacity can perform other jobs that exist in significant numbers in the national economy.  On the basis of the vocational expert's testimony, the Commissioner concluded that Thomason is not disabled within the meaning of the Act.

THOMASON'S ASSERTIONS. Are the Commissioner's findings supported by substantial evidence on the record as a whole? Thomason thinks not and advances the following two reasons why: (1) the severity of his mental impairments was underestimated, and (2) the hypothetical question did not set out all of his impairments.

THE SEVERITY OF THOMASON'S MENTAL IMPAIRMENTS. Thomason maintains that the severity of his mental impairments was underestimated. In support of that assertion, he first maintains that the Commissioner mis-characterized the findings of Dr. George DeRoeck ("DeRoeck"), a consultative physician who performed an evaluation of Thomason's mental condition. See Transcript at 246-255.[1]

DeRoeck never stated that Thomason's mental impairments were mild. It was the Commissioner who so characterized DeRoeck's findings.[2] Although an alternative characterization of his findings is plausible, e.g., they can be construed to indicate symptoms of moderate-to-severe impairments, for the reasons that follow, substantial evidence on the record as a whole supports the Commissioner's characterization.[3]

---

[1] Thomason specifically maintains that "DeRoeck himself did not state that Thomason's mental limitations were only mild; he diagnosed Thomason with personality disorder and assigned him a GAF of 55, indicating moderate, not mild, symptoms." See Document 10 at 26.

[2] DeRoeck's findings were characterized as follows: "He generally found mild limitations due to … mood disorder, personality disorder, and drug dependence. He provided objective results as a basis for this conclusion, and it is consistent with the medical record as a whole." See Transcript at 25.

[3] "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." See Reed v. Sullivan, 988 F.2ds 812, 815 (8th Cir. 1993) (internal quotations and citations omitted).

First, DeRoeck's findings indicate that many of Thomason's psychiatric issues are directly attributable to his considerable illegal drug use or are otherwise "situationally related." See Transcript at 249. Thomason acknowledged being "'moody'" but denied symptoms associated with a bi-polar disorder. See Transcript at 248. He acknowledged being "'really … irritable'" but added, "'it's just hard staying away from the methamphetamine.'" See Id. He also acknowledged symptoms of depression and stated that he had previously been hospitalized for drug dependence and depression, but again, a significant factor in his hospitalization was his extensive illegal drug use.

Second, DeRoeck's findings indicate nothing exceptional about Thomason's overall mental status. Thomason was able to "remain on task and did not appear overtly distracible." See Transcript at 250. He was found to be "organized in his thoughts" and "goal directed," although he did allude to "rumination." See Transcript at 251. He was found to be "lucid, cogent in reasoning and oriented to time, person, place and situation," and "[n]o indication of psychosis was noted." See Id. Mild deficits in abstract reasoning were noted, however, which suggested "[e]vidence of probably mid low average intellectual ability …" See Transcript at 254.

Third, DeRoeck's findings indicate that Thomson articulated an ability to work as long as he is not required to work around people or food. Specifically, DeRoeck quoted Thomason as saying the following: "[I] 'can' engage in employment 'as long as I'm not working with people or food.'" See Transcript at 254.

Last, it is true that DeRoeck diagnosed Thomson as suffering from a personality disorder and assigned him a Global Assessment of Functioning, or "GAF," score of "55," which indicates symptoms of moderate impairments. With regard to the personality disorder, though, the Commissioner adopted that finding and included it in his assessment of Thomason's residual functional capacity. With regard to his GAF score, it is not raw medical data.[4] Even if it were, and thus some aid in accurately assessing his residual functional capacity, the GAF score supports the proposition that DeRoeck's findings are capable of alternative characterizations.

For the foregoing reasons, the Commissioner's characterization of DeRoeck's findings was not improper as they are capable of alternative characterizations. Substantial evidence on the record as a whole supports the Commissioner's characterization that Thomason's mental impairments are mild.

---

[4]

A GAF score of "55" indicates a moderate impairment in psychological functioning. In <u>Kennedy v. Astrue</u>, 247 Fed.Appx. 761, 766, 2007 WL 2669153 at 5 (6th Cir. 2007), the following insight was provided into the relevance of a GAF score:

> GAF is a clinician's subjective rating of an individual's overall psychological functioning. A GAF score may help [the Commissioner] assess mental [residual functional capacity], but it is not raw medical data. Rather, it allows a mental health professional to turn medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning. [Citation omitted].
>
> Furthermore, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" [Citations omitted]. The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning.

Thomason advances an alternative representation in support of his assertion that the severity of his mental impairments was underestimated. He maintains that the Commissioner erroneously relied upon DeRoeck's findings or otherwise accorded his findings greater weight than they were entitled to receive because they are contrary to the findings made by Thomason's treating physicians and other evidence in the record.[5]

In <u>Wagner v. Astrue</u>, 499 F.3d 842, 848-850 (8th Cir. 2007), the United States Court of Appeals for the Eighth Circuit thoroughly reviewed the weight to be accorded various medical opinions. That review was as follows:

> The SSA regulations set forth how the [Commissioner] weighs medical opinions. The regulations provide that "unless [the Commissioner] give[s] a treating source's opinion controlling weight … [the Commissioner] consider[s] all of the following factors in deciding the weight [to] give to any medical opinion:" (1) examining relationship, (2) treating relationship; (3) supportability of the opinion; (4) consistency; (5) specialization; and (6) "any factors [the applicant] or others bring[s] to [the Commissioner's] attention." [Citation omitted]. The regulations provide that if the [Commissioner] finds "that a treating source's opinion on the issue(s) of the nature and severity of [the applicant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial evidence in [the applicant's] record, [the Commissioner] will give it controlling weight." [Citation omitted].

---

[5] At the outset, the Court notes that full consideration of Thomason's assertion has been severely hampered by his failure to cite specific documents in the record. For instance, he represents the following: "The records of [Thomason's] treating physicians, who have seen him for depression, anxiety, bipolar disorder, and panic disorder, confirm that [his] mental limitations are more severe than the [Commissioner] found." <u>See</u> Document 10 at 26. Sadly, Thomason's representation is not supported by the citation to a specific document or documents in the record. Instead, the Court has been forced to dig through the record in an attempt to find documentary support for this, and other, representations made by Thomason.

> "[T]he hearing examiner need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." [Citation omitted]. Likewise, while a treating physician's opinion is generally entitled to "substantial weight," such an opinion does not "automatically control" because the hearing examiner must evaluate the record as a whole. [Citation omitted]. "It is well established that [the Commissioner] may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." [Citation omitted]. "Moreover, [the Commissioner] may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." [Citation omitted].
>
> "When one-time consultants dispute a treating physician's opinion, the [Commissioner] must resolve the conflict between those opinions." [Citation omitted]. "As a general matter, the report of a consulting physician who examined a claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." [Citation omitted]. This court, however, has recognized two exceptions to this general rule:
>
>> We have upheld [the Commissioner's] decision to discount or even disregard the opinion of a treating physician (1) where other medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.

The record reflects that the Commissioner accorded DeRoeck's findings "substantial weight." See Transcript at 25. The Commissioner did so because DeRoeck provided objective results and his findings are consistent with the "medical record as a whole." See Id. For the reason that follows, substantial evidence on the record as a whole supports the Commissioner's decision to accord DeRoeck's findings such weight.

The record reflects that Thomason was seen by physicians at the Paragould Doctors' Clinic during the period from roughly July of 1998 through March of 2007. See Transcript at 291-369, 456-468. The notes from his visits are replete with references to a panic disorder, manic depressive disorder, an unspecified anxiety state, and depression. The notes are also replete with references to his prescriptions for, inter alia, Xanax, Lithium, and Lexapro. Standing alone, those references suggest that Thomason's mental impairments are greater than that found by DeRoeck. The notes, however, additionally reflect the following: (1) that the precise severity of Thomason's mental impairments is difficult to articulate; (2) that the symptoms associated with the impairments generally improve when he takes the prescribed medication, see Transcript at 306, 317, and 358; (3) that there are periods of time when he does not take his medication as directed, see Transcript at 310; (4) that his impairments, particularly his depression, appear to have a seasonal component, specifically, it was noted during one visit that "[Thomason] tends to get depressed only during the fall and winter and then feels better in the spring and summer months," see Transcript at 361; and (5) that on occasion, he reported doing "fairly well," see Transcript at 458. Last, the record contains a number of notes from Thomason's physicians at the Paragould Doctor's Clinic to his employers asking that he be excused from work because of various impairments. A thorough examination of the notes reflects that virtually every note cleared him to return to work.

The record also reflects that Thomason was seen by representatives of Mid-South Health Systems during the period from roughly February of 1999 through June of 2004. See Transcript at 209-245. The notes from his visits reflect that at different points during the five year period, he was diagnosed with various mental impairments and prescribed, inter alia, Zoloft and Lithium. The notes reflect, however, that many of his psychiatric issues were directly attributable to his considerable illegal drug use or were otherwise situational in nature. For example, In February of 1999, Thomason was diagnosed as suffering from a "mood disorder secondary to substance abuse recurrent," and recurrent major depression and a bi-polar disorder were ruled out. See Transcript at 240. In the notes from that visit, the attending physician noted the following: "[I]t is unclear whether [Thomason's] highs and lows, as he puts them, are independent of his substance abuse." See Transcript at 239. Two months later, Thomason reported that his condition had improved. See Transcript at 234. By November of 1999, though, his condition had worsened, primarily because he had stopped taking the prescribed medication and had also returned to using methamphetamine. Specifically, the attending physician noted the following:

> He has been sober for about a month now, is making attempts to get into a substance abuse program. He's also continuing to work full time and reports that as long as he takes the Zoloft, he feels that his mood remains fairly stable, that he does not remain depressed, but if he does not take medication, he feels the compulsive need to use the crystal methamphetamines to get high.

See Transcript at 231. During a February of 2000 visit, the attending physician found that Thomason's depression appeared to be in remission and "now that he's remaining sober, his mood swings appear to have subsided and he is generally managing well." See Transcript at 228. In June of 2003, though, Thomason's condition had again worsened. See Transcript at 209-223. During that period, he was diagnosed with a "substance induced mood disorder." See Transcript at 216. It is not clear what brought about this worsening of his condition.

The record additionally reflects that Thomason was seen by representatives of St. Bernards Medical Center during the period from roughly June of 2003 through July of 2003. See Transcript at 129-178. During that period, he self-referred himself to St. Bernards Medical Center for a three day hospital stay for major depression. The discharge summary reflects that the reason for his admission was as follows:

> Patient with a one year history of methamphetamine use. Stopped using several weeks ago. The patient has been much worse since then. Said most of the time cries a lot, does not sleep well, is suicidal off and on. Patient has been on Lexapro which is helping but has not taken this in the last week.

See Transcript at 131. The discharge summary also reflects that at the time of his discharge, which was at his own request, he was feeling better and his mood was good. See Id.

The Court recites the foregoing for the proposition that the findings of Thomason's treating physicians appear to be inconsistent. Specifically, the findings are capable of alternative characterizations, i.e., they can be characterized to suggest both moderate-to-severe mental impairments and, alternatively, mild mental impairments. Given that inconsistency, the Commissioner could decline to give the findings controlling weight.

What, then, of the Commissioner's decision to give DeRoeck's findings substantial weight? Admittedly, DeRoeck's findings were made following a one-time evaluation of Thomason's mental condition. Nevertheless, the findings are consistent with an acceptable characterization of the findings made by Thomason's other physicians.

The Court finds that the severity of Thomason's mental impairments were not underestimated. The Commissioner did not mis-characterize DeRoeck's findings nor did the Commissioner erroneously rely upon the findings or otherwise accord them greater weight than they were entitled to receive. The findings of the various physicians are simply capable of alternative characterizations, and the Commissioner did not err in adopting the characterization that Thomason's mental impairments are mild.

THE HYPOTHETICAL QUESTION. Thomason next maintains that the hypothetical question did not set out all of his impairments. He specifically maintains that the question did not contain any mention of his mental impairments, "even though the [Commissioner] found that Thomason had a mood disorder and a personality disorder that caused mild nonexertional limitations." See Document 10 at 28.

"'[T]estimony from a vocational expert is substantial evidence [on the record as a whole] only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'" See McKinley v. Apfel, 228 F.3d 860, 865 (8th Cir. 2000) [quoting Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)]. The question need not contain every impairment alleged by the claimant, see Haggard v. Apfel, 175 F.3d 591 (8th Cir. 1999), and need not contain the impairments that impose no restrictions on his "functional capabilities," see Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994) (Commissioner not faulted for not including impairments in hypothetical question in part because there was no evidence impairments imposed restrictions on claimant's functional capacities).

The hypothetical question in the proceeding at bar is admittedly not a model of clarity. It is rather disjointed; it makes reference to a "Monroe," which the Court assumes is a business where Thomason was working at the time; and it identifies a hypothetical individual who is suffering from Hepatitis C, not the Hepatitis B that afflicts Thomason.[6] The question also contains no mention of his mild mental impairments. Nevertheless, for the reason that follows, the Court is satisfied that the question was not improper.

---

[6] The record does contain a reference that Thomason was "exposed [to] Hepatitis C." See Transcript at 306. It appears undisputed, though, that he actually suffers from Hepatitis B as the Commissioner found. Thomason has failed to show how the symptoms associated with Hepatitis B differ from those associated with Hepatitis C and, if they are dramatically different, how that makes the hypothetical question defective.

At the outset, the Court notes that Thomason was represented by counsel during the administrative hearing. Once the hypothetical question was answered, counsel undoubtedly had the opportunity to request that the question be clarified or otherwise re-stated. Alternatively, he could have simply asked the vocational expert a question containing the mild mental impairments suffered by Thomason. Counsel failed to take either course of action.

Notwithstanding the foregoing, the Commissioner could find that Thomason's mild mental impairments pose no restrictions on his "functional capabilities" and, therefore, it was not necessary for the Commissioner to include them in the hypothetical question. Thomason testified during the administrative hearing that the difficulties he experienced while working were associated with the "physical part" of the work and not associated with his mental impairments. See Transcript at 486. Given his testimony, it is possible to conclude, as the Commissioner apparently did, that Thomason's mental impairments did not impact his ability to work.

CONCLUSION. The Court finds that there is substantial evidence on the record as a whole to support the Commissioner's conclusion that Thomason is not disabled within the meaning of the Act. The Commissioner did not underestimate the severity of Thomason's mental impairments, and the hypothetical question in the proceeding at bar was not defective. Accordingly, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this __3___ day of July, 2008.

_____
UNITED STATES MAGISTRATE JUDGE